IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GREGORY A. KNAPP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:13-CV-4396-K-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS. CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Opening Brief,* filed April 28, 2014 (doc. 14) and *Commissioner's Brief*, filed May 27, 2014 (doc. 15).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED,** and the case should be **REMANDED** for reconsideration.

## I.   BACKGROUND

### A.    Procedural History

Gregory A. Knapp (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability income benefits (DIB) under Title II of the Social Security Act.[1]  On March 28, 2011, Plaintiff applied for DIB, alleging disability beginning on January 1, 2010, due to degenerative disc disease.  (R. at 119, 150.)  His application was denied initially and upon reconsideration.  (R. at 62-65, 71-73.)  Plaintiff requested a hearing

---

[1]The background information is summarized from the record of the administrative proceedings, which is designated as "R."

before an Administrative Law Judge (ALJ), and he personally appeared and testified at a hearing held on June 14, 2012.  (R. at 36-58, 75-76.)  On July 3, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 20-35.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied his request on August 27, 2013.  (R. at 3-6.)  Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.      Factual History**

**1.      Age, Education, and Work Experience**

Plaintiff was born on September 9, 1957, and he was 54 years old at the time of the hearing before the ALJ.  (R. at 42, 59, 119.)  He received a GED and has past relevant work as a cabinet installer and a handyman. (R. at 43, 55, 150.)

**2.      Medical Evidence**

Sometime in 1998, Plaintiff had two back surgeries performed by Dr. Kevin Gill.  (R. at 403.)

On December 3, 2008, Plaintiff saw Dr. Gill for burning in his left lower spine and parathesias in the left leg, foot, and toes, and to follow-up with him regarding the past surgeries. (*Id*.)  Physical examination revealed that his heel toe tandem was intact, he had good hip/knee range of motion with "sciatic radiculopathy" in the left leg, no "Hoffman's sign", and no ankle clonus. (*Id*.)  Plaintiff reported that he had leg cramping in the fetal position at night, but that he had no pain in his neck.  (*Id*.)  He also reported that he had a motor vehicle crash two months prior to the visit, and he worked full time but had a helper to do the "overall heavy stuff."  (*Id*.)  Dr. Gill diagnosed him with "thoracic or lumbarosacral neuritis or radiculitis."  (R. at 402.)  He ordered an MRI of his lumber spine to make sure there was nothing new associated with the motor vehicle crash.  (R. at 403.)

On December 4, 2008, Plaintiff's wife called Dr. Gill's office asking if Dr. Gill could call in a prescription for Celebrex because Plaintiff forgot to ask for a prescription the day before at his office visit. (R. at 399.) Dr. Gill's physician assistant called in the prescription. (*Id.*)

Based on the MRI of Plaintiff's lumbar spine, Dr. Gill noted an impression of "[m]ultilevel degenerative and postsurgical changes without evidence of canal or neuroforminal stenosis." (R. at 395.) The MRI showed nothing new attributable to the motor vehicle accident, and he recommended physical therapy and pain management as needed. (R. at 394.)

On July 27, 2009, Plaintiff's wife again called Dr. Gill's office seeking a refill of Plaintiff's pain medication. (R. at 388.) She requested that Dr. Gill recommend another doctor if he would not authorize a refill because she claimed that Dr. Gill would not treat Plaintiff. (*Id.*) Dr. Gill referred Plaintiff to Dr. Carl Noe at the Eugene McDermott Center for Pain Management at UT Southwestern (the Pain Center). (R. at 386.)

On August 10, 2009, Plaintiff saw Dr. Noe, seeking an evaluation for back pain. (R. at 380.) Dr. Noe noted that Plaintiff had moderately severe chronic pain on a daily basis, multiple joint pain, and has been on Hydrocodone. (*Id.*) Upon physical examination, he observed that Plaintiff's gait was intact, his station stable, he had no cyanosis clubbing or swelling, his heel and toe walking was intact, his sensation to cold was decreased in the left leg, his deep tendon reflexes were symmetrical in the lower extremities, and he had a negative straight-leg test. (R. at 381.) Dr. Noe diagnosed lower back pain, and he prescribed a trial of Tramadol for pain. (R. at 381-82.)

Plaintiff called Dr. Noe on September 21, 2009, complaining that the Tramadol made him nauseated and caused vomiting. (R. at 377.) Dr. Noe prescribed him Propoxyphene to take instead of the Tramadol. (*Id.*)

On October 23, 2009, Plaintiff presented to Dr. Joseph Borelli at UT Southwestern Department of Orthopaedic Surgery (the Orthopaedic Surgery Department) as a new patient. (R. at 359.) Plaintiff reported that he recently had difficulty straightening his knee, and his daughter has had to help him pop it back into place. (*Id.*) He described the pain in his knee as "sharp and shooting", severe, and accompanied by swelling. (*Id.*) Upon physical examination, Dr. Borelli noted that Plaintiff moved both upper extremities and his lower right extremity freely and without limitation. (*Id.*) Examination of his left lower extremity revealed "palable dorsalis pedis and posterier tibial pulses" as well as normal sensation and good capillary refill distally. (*Id.*) Dr. Borelli noted that his left knee had an effusion of moderate severity and palpable tenderness as well as limited extension capabilities. (*Id.*) Dr. Borelli ordered an MRI of Plaintiff's left knee and noted that he likely had a meniscal tear.[2] (*Id.*) He also referred Plaintiff to Dr. William J. Robertson at the Orthopaedic Surgery Department for "possible scope debridement of his meniscus." (*Id.*)

Plaintiff's MRI revealed a chronic anterior cruciate ligament (ACL) deficient knee with a bucket handle tear on the medial and lateral meniscus. (R. 347, 353.) On November 9, 2009, Plaintiff presented to Dr. Robertson for an initial visit complaining of mild to moderate pain and swelling in his knee. (R. at 346.) Plaintiff reported that his knee kept locking, which was disabling to him due to his carpentry and plumbing work. (*Id.*) Upon physical examination, Dr. Robertson noted that Plaintiff's knee could not be fully passively extended, but it did fully extend on the

---

[2] A mensicus tear is a tear of the mensicus, which is C-shaped piece of tough, rubbery cartilage in the knee that acts as a shock absorber between one's shinbone and thighbone. Mayo Clinc, http://www.mayoclinic.org/diseases-conditions/torn-meniscus/multimedia/torn-meniscus/img-20007984 (last visited February 24, 2015).

contralateral side.  (R. at 347.)  He recommended that Plaintiff undergo a left knee arthroscopy[3] and a partial medial and lateral meniscectomy[4] and chrondoplasty.  (*Id*.)

On November 11, 2009, Plaintiff called Dr. Noe seeking a refill of Darvon.  (*Id*. at 342.)  Dr. Noe's nurse practitioner informed him to follow-up with Dr. Noe for a re-evaluation and medication refill.  (*Id*.)  He saw Dr. Noe on November 12, 2009, and he indicated that the pain level in his back was at an 8 out of 10.  (R. at 338.)  Dr. Noe diagnosed him with pain in the soft tissues of the limb. (*Id*.)  Plaintiff was given a prescription and told to follow-up for more refills.  (R. at 338-39.)

On December 1, 2009, Dr. Robertson conducted a left knee arthroscopy, a partial medial meniscectomy, and a partial lateral meniscectomy on Plaintiff. (R. at 332.)  Plaintiff returned to Dr. Robertson on December 2, 2009, complaining of severe postoperative pain and knee swelling.  (R. at 324.)  A physical examination revealed that there was no effusion in Plaintiff's left knee and no erythema, and his incision was clean, dry, and intact.  (*Id*.)  Dr. Robertson noted that Plaintiff's acute flair in pain was mostly due to him over-exerting his knee over the last several hours.  (*Id*.)  He recommended that Plaintiff take Norco and Aleve for the pain, and he gave him crutches.  (*Id*.)  He also injected his left knee with Cortisone and Lidocaine for immediate pain relief.  (*Id*.)

On March 3, 2010, Plaintiff saw Annie Abraham, a nurse practitioner at the Pain Center for chronic pain in his back and knee.  (R. at 317-18.)  Physical examination revealed that his gait was intact, his station stable, and he had no cyanosis, clubbing, or swelling.  (R. at 318.)  Ms. Abraham

---

[3]Arthroscopy is a minimally-invasive procedure used for the diagnosis and treatment of conditions affecting joints.  John Hopkins Medicine,
http://www.hopkinsmedicine.org/healthlibrary/test_procedures/orthopaedic/arthroscopy_92,P07676/ (last visited February 24, 2015).

[4]Meniscectomy is the surgical removal of all or part of a torn meniscus.  *Web*MD,
http://www.webmd.com/a-to-z-guides/meniscectomy-for-a-meniscus-tear (last visited February 24, 2015).

recommended that he continue Darvon and Flexeril and follow-up with her for medication refills in three months. (*Id.*)

Plaintiff returned to Ms. Abraham on June 7, 2010 with complaints of pain at a 9 out of 10. (R. at 314.) On September 10, 2010, Ms. Abraham denied his request for a refill of Darvon. (R. at 312.)

In October 2010, Plaintiff was in another motor vehicle accident. (R. at 228.) He suffered an onset of severe headaches, neck pain, cervicalgia, and referred pain in the left shoulder, left arm and right arm. (*Id.*)

On January 1, 2011, Plaintiff saw Dr. Gill for neck pain. (R. at 199.) Physical examination revealed Plaintiff had no arm pain, no weaknesses, "no Hoffman's sign", and no ataxia. (*Id.*) Dr. Gill noted that he had good neck mobility and normal gait, but he had a tender trapezius that was worse on the right side. (*Id.*) Dr. Gill diagnosed him with cervicalgia and chronic low back pain, and he ordered a cervical MRI. (*Id.*)

On February 8, 2011, Plaintiff presented to UT Southwestern's radiology department for the MRI. (R. at 202.) The MRI of his cervical spine showed "[s]pondylosis at C5/C6 and C6/C7 with mild spinal canal stenosis and neuroforminal stenoisis." (R. at 208.) The spondylosis[5] was most prominent at C6/7. (R. at 307.) The MRI of his lumbar spine showed "[n]o significant change since prior examination of multilevel lumbar spondylosis without spinal canal stenosis." (R. at 208.)

At the recommendation of Dr. Gill, Plaintiff was admitted to UT Southwestern hospital for anterior cervical discectomy and fusion (ACDF) (C5/6 and C6/7) surgery due to neck and arm pain

---

[5]"Spondylosis is a general or []umbrella[] term for the degenerative disease process affecting the spine, in particular, the intervertebral discs and the vertebral facet joints." The Spine Center, NYU Langone Medical Center, http://hjd.med.nyu.edu/spine/patient-education/spine-problems/back-and-leg-pain/spondylosis (last visited February 24, 2015).

on February 21, 2011.  (R. at 218, 307.)  His pre-operative diagnosis was cervical stenosis C5/6 and C6/7, and a physical exam before the surgery revealed loss of full mobility in the neck, positive spurlings on the right side, diminished light touch in the right lateral forearm and right hand, tender trapezius on both sides, no ataxia, "no Hoffman's sign", no ankle clonus, and a normal gait. (R. at 221.)  It was noted that Plaintiff was right hand dominant.  (R. at 220-21, 228.)  He was discharged the next day with instructions to do no heavy lifting overhead for two months and to follow up with Dr. Gill in two weeks.  (R. at 218-19.)

On May 20, 2011, Dr. San-San Yu,  a state agency medical consultant (SAMC), completed a Case Assessment for Plaintiff.  (R. at 247.)  She found that Plaintiff had no medically determinable impairments because there was insufficient evidence prior to Plaintiff's date last insured for her to make a determination.  (*Id*.)  She also found that  his allegations were not supported by the evidence of record.  (*Id*.)

On June 15, 2011, Plaintiff called Dr. Gill seeking a referral to a pain management doctor, and Dr. Gill referred him to Dr. Itvni at the Pain Clinic.  (R. at 295.)  On June 17, 2011, he returned to Dr. Gill due to back pain.  (R. at 289.)  Dr. Gill noted that Plaintiff last worked full time in 2009, and he was doing well with his neck, which had full motion.  (*Id*.)  An X-ray of his cervical spine showed a healed cervical fusion which "looked good" and presented "no issues."  (R. at 290, 293.)  However, Plaintiff had constant back pain, his lumbar spine hurt, and he had limited motion.  (R. at 289.)  Dr. Gill found that Plaintiff was disabled with chronic lower back pain.  (R. at 290.)  He discussed with Plaintiff the option of doing a total disc replacement but noted that it was not a good option because Plaintiff would not be reimbursed.  (*Id*.)

Dr. Laurence Ligon completed a Case Assessment on August 16, 2011, for reconsideration

of the May 20, 2011 Case Assessment.  (R. at 249.)  Based upon the evidence in the file, Dr. Ligon

reaffirmed Dr. Yu's Case Assessment, finding insufficient evidence prior to the date last insured and

that the alleged limitations were not supported by the medical evidence of record and other evidence

in the file.  (*Id*.)

On December 6, 2011, Plaintiff called Dr. Gill's office and requested a referral to another pain

management doctor, and he was referred to Pinnacle Pain Medicine.  (R. at 285.)

On April 18, 2012, Plaintiff called Dr. Gill to inquire whether cold laser treatment would be

okay for his spine because his sister paid for him to have the procedure at a pain management facility.

(R. at 252.)  Stella Carter at Dr. Gill's office informed him that there were no restrictions because it

had been more than one year since his surgery.  (*Id*.)

On June 6, 2012, Dr. Gill completed a medical source statement.  (R. at 407.)  He opined that

in the context of trying to hold a job on a regular basis, Plaintiff was reasonably likely to have missed

an average of more than three days of work per month due to his medical condition for the period of

January 1, 2010 through September 30, 2010.  (*Id*.)  He also opined that Plaintiff's medical condition

was essentially unchanged since September 30, 2012.  (R. at 409.)  Finally, he opined that Plaintiff

could stand/walk continuously for 15 to 30 min before alternating postures to sitting or lying down

for a total of 2 hours in an 8-hour day; could sit in a working position continuously for 15 min before

alternating to standing or lying down for a total of 3 hours in an 8-hour work day; required rest for

pain management for 2 to 3 hours in an 8-hour work day; could lift and/or carry 10 pounds

occasionally and more than 10 pounds rarely or never; could reach and grasp with his hands

occasionally and finger with his hands frequently; and could rarely, if ever, climb, balance, stoop,

crouch, kneel, or crawl in an 8-hour work day.  (R. at 412.)  He noted that Plaintiff's condition

existed and persisted with these restrictions from January 1, 2010 through September 30, 2010.  (*Id.*)

### 3.    Hearing Testimony

On June 14, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 36-58.)  Plaintiff was represented by an attorney.  (R. at 38.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born on September 9, 1957, was 54 years old, 6 feet 4 inches tall, weighed 200 pounds, and was right-handed.  (R. at 42-44.)  He was divorced and had a 20 year old daughter.  (R. at 43.)  He received his GED and attended one year of college, and he suffered from dyslexia.  (*Id.*)  He was honorably discharged from the United States Air Force.  (*Id.*)

He did not smoke and rarely drank alcohol.  (R. at 44.)  He had a home repair business in the last fifteen years repairing "pretty much anything in a house."  (*Id.*)  He stopped working or significantly changed his business in January 2010 because his back could not handle it anymore. (*Id.* at 45.)  His business had a rough year in 2009.  (*Id.*)  He had to hire a couple of guys to help him out because "[i]t [was] just too hard for [him]", and he had "pretty much non-stop pain" in his back. (*Id.*)  In 2010, his sister-in-law talked him into doing a home repair job for her on a house she was trying to buy.  (R. at 44.)  His daughter and her friend painted the house and installed "snap-together" flooring.  (R. at 45.)  The work he did himself was  "fill out paperwork for HUD or something."  (R. at 44-45.)  His sister-in-law bought all the appliances, some ceiling fans, a garbage disposal, and other things that were missing from the house, which were things that would have normally been done by the contractor if she had not hired Plaintiff.  (R. at 45.)

Plaintiff originally injured his back doing commercial drywall on a high-rise building that was being built.  (R. at 45.)  He did not have a climbing strap, and he just put a safety strap around his

back as opposed to having one that went around his legs.  (R. at 46.)  He reported that "the disease [he] had basically ripped the disks out of [his] back."  (*Id*.)

He had a diskectomy in 1992, and was in severe pain for about five years.  (*Id*.)  In 1998, Dr. Gill fused three of the vertebras in his back.  (*Id*.)  Dr. Gill also fused three vertebras in his neck with a steel plate and some screws because his "disease was eating up [his] neck."  (*Id*.)

After his first two back surgeries, Dr. Gill told him to go to college if he could and not to lift anything heavier than his plate with his dinner on it.  (R. at 46-47.)  Plaintiff told Dr. Gill that there was no way he could go to college and support himself.  (R. at 46.)

In 2008-2009, Plaintiff had to turn down work that he was unable to do physically.  (R. at 47.)  His back has continued to bother him, and he had constant pain in "pretty much" his whole back.  (R. at 47-48.)  He reported that the pain felt as if someone took a screw and "ran it in his back".  (*Id*.)  He experienced a burning sensation, like sciatica, down both legs and down to his toes.  (R. at 47.)  The sensation was worse on the left side, and his big toe was always numb.  (*Id*.)  Bending over aggravated his pain, and he could never get comfortable standing, sitting, or "anything."  (R. at 47-48.)

He took Norco, which did not get rid of the pain but took the edge off.  (*Id*.)  Hydrocodone made him feel "real stupid kind of" and was "like being loaded on something."  (*Id*.)  It also made him constipated and was "just a nightmare."  (*Id*.)

In addition to taking medicine, Plaintiff laid down on concrete (or something similar) and put his legs up in order to relieve the pain.  (*Id*.)  In a typical 8-hour day, he usually laid down for 2-3 hours, but there were days when he had to lay down more than that due to the pain.  (*Id*.)  One to 2 days a week, he laid down all day with a heating pad.  (*Id*.)

He also suffered from semi-sharp pain in his left knee right under his knee cap and in the back of his knee.  (*Id.*)  He reported that the pain was not super sharp, and if he walked or was just sitting around, it was not too bad.  (*Id.*)  He had a procedure on his knee where they "scoped it out."  (*Id.*)  However, he had a torn ACL that was not fixed.  (R. at 50.)  His knee gave him a problem mainly when he walked, but also when he stooped down and squatted.  (*Id.*)  The pain affected his ability to climb a ladder or balance on something, and it affected his ability to sleep at night.  (*Id.*)  He slept for maybe an hour or two at most, and then he woke up and pulled his knees up due to real bad leg cramps in the front and back of his legs.  (*Id.*)  He woke up about 3 to 4 times a night and got about 4 to 5 hours of sleep per night, which made him very tired the next day.  (R. at 50-51.)

   In September of 2010, on average, he could stand 15-30 minutes before he needed to sit or lay down, and it was the same as of the date of the hearing.  (R. at 50.)  From January to September 2010, his knee was bad and he could walk maybe 5-10 minutes.  (*Id.*)  He reported that it was the same as of the date of the hearing.  (*Id.*)  During that same time frame and as of the date of the hearing, he had problems sitting, and he would typically be able to sit in a working position for 15-20 minutes before he needed get up and move around.  (R. at 51-52.)

Plaintiff's attorney noted that several times while giving his testimony, he sat on the edge of his seat and leaned back.  (R. at 52.)  Plaintiff reported that although he could never get comfortable, that position felt better than sitting straight up.  (*Id.*)  His attorney also noted at one point during his testimony that he stood up and leaned against the wall.  (R. at 53.)  Plaintiff reported that putting pressure on his back like that helped him.  (*Id.*)

He stated that he had "that disease" all in his joints, hips, shoulders, and elbows.  (R. at 53.)  He hurt his rib one time, and a doctor told him that he had the worse arthritis that doctor had ever

seen.  (*Id*.)  It hurt him to reach above his head or straight out.  (*Id*.)  It was harder for him to do activities around the house or even to get dressed.  (*Id*.)  His back locked up when he tied his shoes, and he had to sit on the bed in order to put on his pants.  (R. at 53.)  He tried not to vacuum, and he used a bundle service at the laundromat for his laundry.  (*Id*.)  He went to the Dollar Store to get a few groceries.  (*Id*.)  He did some cooking, but he tried to use a crock pot or to microwave a lot of TV dinners because cooking was difficult for him.  (*Id*.)  Plaintiff still drove, but his daughter drove him to the hearing that day.  (*Id*.)  He did not drive long distances, and he had problems with riding as a passenger for long distances.  (R. at 53-54.)  He had to get out of the car and move around about every 30 minutes.  (R. at 54.)  He did not go to the movies, the mall, or to church, and he did not really go out and visit people.  (*Id*.)  He liked building things, but he no longer did much of it.  (*Id*.) He did not use a cane or an assistive device.  (*Id*.)

### b.     *VE's Testimony*

The VE classified Plaintiff's past relevant work as a cabinet installer (medium, skilled, SVP-7) and a handyman (medium, skilled, SVP-7).  (R. at 55.)  She stated that there were no transferable skills in those positions.  (*Id*.)

The ALJ asked the VE to opine whether a hypothetical person with that same vocational profile could perform Plaintiff's past relevant work if he could stand/sit/walk up to 6 hours, alternating sitting and standing at-will throughout the day; lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently; occasionally crawl, squat, stoop, bend, and climb; and avoid working at heights or climbing ladders.  (*Id*.)  According to the VE, that residual functional capacity (RFC) would preclude the past relevant work that Plaintiff performed.  (*Id*.)  When asked by the ALJ whether there were any other occupations available to persons with those abilities, the VE testified

12

that there were other jobs at the light level such as a cashier II (light, unskilled, SVP-2), with 7,500 jobs in Texas, and 91,000 nationally; a production worker (light, unskilled, SVP-2); garment sorter, with 6,000 jobs in Texas, and 109,000 nationally; assembler (light, unskilled, SVP-2); subassembler, with 1,500 jobs in Texas, and 20,000 nationally.  (R. at 55-56.)  She testified that her descriptions were not consistent with the Dictionary of Occupational Titles, because it classifies light work as standing 6 out of 8 hours and does not address the sit/stand option.[6]  (R. at 56.)  Based on her education and experience, she believed that the jobs could be performed with a sit/stand option.  (*Id*.)

Plaintiff's attorney asked the VE to opine whether a hypothetical person with the same vocational profile would be able to perform the jobs mentioned by the VE if he could stand/walk only 2 hours a day; sit for 3 hours a day; need to rest the remaining period of time by lying down; and occasionally lift up to 10 pounds.  (*Id*.)  The VE testified that the hypothetical person would not be able to perform the jobs with those limitations.  (*Id*.)

In response to Plaintiff's attorney question regarding the ALJ's hypothetical, she testified that the hypothetical individual would need to be able to sit or stand 15-20 minutes at a time, and if he

_____

[6]The social security regulations define light work in the same way as in the Dictionary of Occupational Titles:

Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). The primary difference between sedentary and most light jobs is that light work requires a good deal of walking or standing.  SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983).  "'Frequent' means occurring from one-third to two-thirds of the time." *Id*. at 6.  "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. *Id*.  "Sitting may occur intermittently during the remaining time." *Id*.

did it any less than that, the jobs would be hard to maintain.  (R. 56-57.)  She also testified that, outside of her personal experiences, she could not speak to the availability of any vocational studies.  (R. at 57.)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on July 3, 2012.  (R. at 23, 31.)  At step one,[7] he found that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2010, through his date last insured of September 30, 2011.  (R. at 25.)  At step two, he found that Plaintiff had four severe impairments: cervicalgia, chronic lower back pain, cervical spondylosis and lumbar degenerative disc disease.  (*Id.*)  Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of any impairment listed in the social security regulations.  (*Id.*)  Next, the ALJ determined that Plaintiff had the RFC to perform light work, which entails lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking no more than 4 hours in an 8-hour workday, sitting for a total of 6 hours in an 8-hour workday, pushing and pulling with weights given; occasionally bend, kneel, stoop, crouch, and crawl, but precluded from climbing ladders and from being exposed to hazards including working at unprotected heights and around dangerous moving machinery.  (R. at 26.)  At step four, he found that through the date of last insured, Plaintiff was unable to meet the physical demands of his past relevant work as a cabinet installer and handyman.  (R. at 30-31.)  Based on the VE's testimony, the ALJ found that through the date of last insured, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that claimant could have performed.  (R. at

---

[7] The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

31.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his onset date through the date of last insured.  (R. at 32.)

## II.  ANALYSIS

### A.      Legal Standards

#### 1.       Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court

may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 and n.1.

## 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional

capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents two issues for review:

(1)      Circuit law holds that an ALJ cannot derive a residual functional capacity without the support of a medical opinion–because an ALJ cannot determine the effects a claimant's condition has on the ability to work. The Administrative Law Judge rejected the opinion of [Plaintiff's] treating orthopedic surgeon Dr. Gill–the only opinion evidence of record discussing the effects of [Plaintiff's] physical condition had on his ability to work. Was the ALJ's RFC supported by substantial evidence?

(2)      An Administrative Law Judge may not reject a medical opinion without good cause, and must apply the 20 C.F.R.§ 404.1527(c) factors to weigh opinion evidence. The ALJ's reasons for rejecting Dr. Gill's opinion did not establish good cause, and the

17

ALJ did not apply the § 404.1527(c) factors before giving the opinion no weight.  If the ALJ ignored the law, did he err and leave his residual functional capacity unsupported by substantial evidence?

## C.     RFC Assessment

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because he derived the RFC without the support of a medical opinion.  (doc. 14 at 18.)  The Commissioner responds that the ALJ properly determined Plaintiff's RFC based upon the relevant medical evidence.  (doc. 15 at 7.)

Residual functional capacity is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  He may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the

court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Relying primarily on the Fifth Circuit's opinion in *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because there was no interpretative medical opinion regarding his ability to function with his back impairment. (doc. 14 at 19, 22.) The Commissioner responds that medical records do not need to contain medical opinions in order for an ALJ to determine a claimant's disability, and *Ripley* explicitly stated than an ALJ could rely upon treatment notes in the absence of an acceptable medical source statement. (doc. 15 at 7.) He claims that Dr. Gill and Plaintiff's other treating sources opined that Plaintiff could stand and walk normally, that his cervical spined looked good and had no issues, and that he had no restrictions. (*Id.*) Accordingly, the Commissioner argues that the ALJ's RFC was based upon substantial evidence in the record. (*Id.*)

In *Ripley*, the ALJ found that the claimant could perform sedentary work even though there was no medical evidence or testimony to support that conclusion. 67 F.3d at 557. The Fifth Circuit instructed that when no medical statement of a claimant's RFC is provided, the court must focus on

whether the ALJ's decision is supported by substantial evidence in the record.  *Id.* In that particular case, the Fifth Circuit noted that the record contained a vast amount of evidence establishing that the claimant had a back problem, but it did not clearly establish the effect the condition had on his ability to work.  *Id.*  It remanded the case with instructions to the ALJ to obtain a report from a treating physician regarding the effects of the claimant's back condition on his ability to work.  *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence that discussed the extent of the claimant's impairment substantially supported the ALJ's RFC assessment because it was unable to determine the effects of the claimant's condition, no matter how small, on his ability to work absent reports from qualified medical experts.  *Id.* at 558 n. 27.  According to *Ripley*, in order to be substantial, the evidence must focus on the effects that medical impairments have on a claimant's ability to work.  *See id.* at 557-58; *see also Browning v. Barnhart*, No. 1:01-cv-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).  .

The ALJ's opinion states that he reviewed Dr. Gill's medical source statement regarding the effect Plaintiff's impairments had on his ability to work and perform physical activities.  (R. at 29.) The ALJ states that he incorporated into his RFC many of the limitations noted by Dr. Gill, including a need to avoid climbing ladders and work around unprotected heights and dangerous moving machinery.  (*Id.*)  However, he found that the other limitations noted by Dr. Gill were not supported by the record as a whole and were inconsistent with Plaintiff's long performance of "past skilled, medium to heavy work after 2010 as a handyman", as well as the activities of daily living outlined in his function report[8] and as described at the hearing before the ALJ.  (R. at 29-30.)  Accordingly,

---

[8]In his function report, Plaintiff reported that he does the following daily living activities: feeds his cat, does most household chores, prepares meals such as sandwiches and frozen meals, walks and drives his car, handles his finances, plays a guitar, and talks to his family.  (R. at 166-71.)

he concluded that Dr. Gill's opinion was not entitled to controlling weight. (R. at 30.)  In his discussion of the medical evidence, he noted Plaintiff's history of back and neck surgery as well as his chronic neck and back pain.  (R. at 26-27.)  He pointed to Plaintiff's complaints of severe headaches, pain in arms and shoulders, dizziness, blurred vision, decreased hearing, and difficulty swallowing.  (R. at 28.) He also referenced imaging results that showed spondylosis on the cervical spine but no fractures or instability, as well as physical exams in 2011 reporting that his cervical spine was in good condition but had some limited lumbar motion.  (R. at 27-28.)

The ALJ's decision reflects only that he incorporated the limitation that Plaintiff should rarely or never climb - one of out about eighteen limitations.  Thus, he rejected Dr. Gill's opinion and gave it no weight. While he may choose to reject Dr. Gill's opinion, "he cannot independently decide the effects of Plaintiff's ... impairments on [his] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v.Astrue*, No. 3:12-cv-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013). Therefore, in order for the ALJ's decision to be supported by substantial evidence, he must have relied on another medical opinion in the record regarding the effects Plaintiff's impairments had on his ability to work.

As in *Ripley*, the record in this case includes treating sources' medical evidence establishing that Plaintiff suffers from chronic back pain, including clinical notes and lab reports.  However, none of that evidence addresses the effects his conditions have on his ability to work.  *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered from certain physical impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work" and the ALJ could

not rely on that "raw medical evidence as substantial support for" the claimant's RFC). The SAMCs determined that Plaintiff's impairments were not severe at both the initial and reconsideration levels, so they did not complete a RFC assessment for Plaintiff or opine as to the effects his impairments had on his ability to work.  (*See* R. at 247, 249.)  Besides Dr. Gill's, there were no other medical opinions regarding the effects Plaintiff's medical impairments had on his ability to work.  Accordingly, there is no medical evidence supporting the ALJ's RFC finding.[9]  *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009)( "[a]n ALJ may not–without the opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Hamblen v. Colvin*, No. 3:12-cv-2009-BH, 2013 WL 4858750, at *12 (N.D.Tex.Sept. 12, 2013)(finding the ALJ impermissibly relied on her own medical opinions to find that the claimant's gastro-intestinal impairments had no effects on his ability to work where there was no evidence in the record showing that a physician completed a physical RFC assessment or even opined about his ability to perform work-related functions despite his gastro-intestinal impairments); *Moreno v. Astrue*, No. 5:09-CV-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010), *rec. adopted*, 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010) (explaining that without expert medical interpretation, "evidence describing the claimant's medical conditions is

---

[9]The only evidence concerning the effects Plaintiff's impairments have on his ability to work came from the function report and testimony of Plaintiff.  In making his RFC determination, the ALJ noted that the performance of Plaintiff's activities of daily living was not inconsistent with many of the basic activities of work.  (*See* R. at 29.) Although Plaintiff indicated that he was able to feed his cat, do most household chores, prepare meals such as sandwiches and frozen meals, walk and drive his car, handle his finances, play a guitar, and talk to his family, he claimed that he could only do most activities in short intervals and at a slow pace.  (*See* R. at 52-54, 166-71.); *see also Ripley*, 67 F.3d 552, 557 n. 28 (finding the only evidence of claimant's ability to work came from the claimant's testimony upon which the ALJ considered when making his RFC, and although claimant testified that he went to church, rode in a car, and drove occasionally, the ALJ failed to consider his testimony regarding his limitations in performing those tasks).

insufficient to support an RFC determination"). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Lagrone v. Colvin*, No. 4:12-cv-792-Y, 2013 WL 6157164, at *6 (N.D.Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments); *Newsome v. Barnhart*, No. 3:03-cv-3030-D, 2004 WL 3312833, at *4 (N.D.Tex. Oct. 8, 2004)("[A]lthough the instant record contains some substantial evidence that [the claimant] suffers from 'mild' fibromyalgia that has improved with medication, the record lacks substantial evidence to support the ALJ's findings concerning *the effect* of this condition on her work-related abilities.").

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his physical RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). As in *Williams*, the ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff is not disabled. *See*

*Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC).[10]

### III. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED** on this 25th day of February, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

 A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[10]Because the ALJ's proper determination of Plaintiff's RFC on remand will likely affect Plaintiff's remaining issue, it is not addressed.